Case No. 19-5359 is for Mr. Sheldon for the appellant and Mr. Ramkumar for the appellate. May it please the court. My name is Robert Sheldon. I'm arguing on behalf of the appellant Alder Cruz. I'd like to reserve three minutes for rebuttal. Virtually every person in the Even those who came in the Mayflower were fleeing religious persecution. None of these ancestors were forced by armed police to go to a place controlled by criminal gangs where they or their families were likely to be murdered, raped, kidnapped, or robbed, especially with no hearings or procedure. On June 24, 2018, President Trump tweeted, when somebody comes in, we must immediately, with no judges or court cases, bring them back from where they came. Then in announcing the Migrant Protection Protocol, the defendants denounced misguided court decisions and outdated laws. We can see the administration first made the decision to force 65,000 asylum seekers, including 16,000 children, to Mexico, and then they looked around for a law to justify their actions. These asylum seekers included Mr. Cruz, a college senior who escaped Guatemala when his life was threatened by gangs, who had already murdered his best friend because of his sister's church activities. So the defendants found the statute, 8 U.S.C. 1225 B2C, and decided to claim this for their legal authorization. However, the statute doesn't work at all for their purposes. I'd like to explain, first, why the MPP isn't authorized by the law at all. Second, why it especially isn't legal for people like Mr. Cruz, who were in the United States when they were apprehended. And I'd like to move on to due process, withholding of removal, international law, injunction factors, and other arguments. Before you start, can I just ask for what the status of his removal proceeding is? He has barely begun. I mean, he went to master hearings, and he hasn't even been able to submit his asylum application. He was supposed to submit it in court, but the court was canceled because all the MPP courts are canceled right now. So his was among them. So he's never even submitted his asylum application. Thank you. So Section 1225 has two relevant subsections. B1, which is people with no documentations and fake documents, which is obviously which all the MPP people, including Mr. Cruz, should be under. And B2, which is for other people, basically those who arrived to the United States legally with documentation, but they're inadmissible. In other words, they've committed some crime or they have some other inadmissibility. The Supreme Court in Jennings versus Rodriguez said these are two separate categories. And the Ninth Circuit and Innovation Law Labs found that these subsections are mutually exclusive, which we completely agree with. Obviously a B2 can't be a B1 because they have documents. But at the same time, there's no way a B2 can be a B1 for several reasons. First of all, the title is Other Aliens, which as the Ninth Circuit said, Other means other. And then second, the statute is, this is the main reason. I mean, the statute specifically and expressly has a section called exceptions and it specifically says you cannot apply B2 to someone to whom B1 applies. Mr. Sheldon, let me interrupt if you could. If someone who is eligible for B1 doesn't fit ever into the B2 box, how is it possible for immigration to do what they frequently do, which is take someone eligible for the B1 box and instead send them into the non-expedited proceedings provided for in the B2 box? Okay. So that's a great question. You know, the statute clearly says they can't do that, but then the BIA in a case called ERM said they can go ahead and place them in proceedings. I mean, the BIA basically said that when Congress said, you know, shall, shall be removed if they don't go into credible fear, they actually meant will. I mean, those are the words they use. I take it, it sounds like your argument is that although it is frequently done, the statute actually prohibits it. And if we adopt your reading of the statute, then we would be concluding that this common practice by Homeland Security is illegal. No, Your Honor, not at all. Because EMR doesn't say that. I mean, that's what the government says EMR says, but they're completely, you know, that's just simply not true at all. EMR says they can be placed in removal proceedings. Nowhere does it say they can be placed into B2, which is just a complete invention on the part of the government. Let me try asking a different way. Is it legal for Homeland Security to take someone who qualifies for B1 expedited removal and to put them into non-expedited removal procedures? Absolutely not. I mean, there's no provision whatsoever. The law clearly says they can't and EMR doesn't. ERM doesn't say that either. I mean, it's, you know, they, like I said, they needed to find us a statute and they just, but it doesn't work at all. Is there a tension between your two statutory arguments? Let me tell you why I think there might be, and then you can tell me why. If I'm off base, you can tell me why I'm off base. On the one hand, you make the argument that you've just been making, that an immigrant is either in the B1 box or the B2 box. The B2 box with regard to undocumented immigrants applies to people who have been in the country for two years or more. That's because the B1 box applies to people who are arriving without documents and the people who have been here for less than two years without documents. If that theory is right, that the B2 box only applies to undocumented, among the undocumented population, the B2 box only applies to those who have been here for two years or more. How can your second argument be correct? That B2-3, when it says an immigrant who is arriving in the present tense, how could that ever apply to anyone? Because as you've defined it in the universe of undocumented immigrants at least, B2-3 is not supposed to apply to anyone who has been in the country less than two years. At the same time, you can't be arriving if you've been here longer than two years. Thank you, your honor. That's a completely misreading of the statute. The statute divides into two groups. B1 is people without documents and people who have fake documents. B2 is everybody else. I guess the government likes to create, what they're trying to do is create a lot of smoke and make this a lot more complicated. Immigration law is complicated, but the statute is really pretty simple in that sense. Mr. Sheldon, let me ask. Can you give me an example of an undocumented immigrant that B2-3 would apply to? Your honor, that's okay. Basically, everybody who has documentation. In other words, anyone, let's say they're coming- Mr. Sheldon, can you give me an example of an undocumented immigrant that B2-3 would apply to? Yes, someone who came in a tourist visa and overstayed. They are legally entitled to be in the country and then they overstayed. Actually, B2 is supposed to be more for people who are coming to the United States, so it really wouldn't apply that much to people in the United States, if that's what the court's referring to. It could. It could under the terms. It's really designed for people that are arriving to the United States that have documents, that have a legal status, have a visa, have a legal status, but they're inadmissible. That's what B2 is for, which obviously excludes everybody in the MPP. It's really very, very straightforward. Can I ask a fact question? I take it Mr. Cruz was 300 yards from the border. Do you know how long he had been across the US border, time-wise? I'm sorry, your honor. We don't know the exact time. He says long enough to go 1,182 feet. It wasn't a terribly long time, but certainly- My last question for now, and then I'll get out of your way and out of my colleague's way. The Rossingham says that an immigrant who is 25 yards, well, it dealt with entered the country. That immigrant is arriving. I suspect you will tell me that anyone who's 26 yards or farther from the border has entered and is no longer currently arriving. Is that right? Yes, your honor. That's completely correct. For a lot of reasons. The due process clause, I think the court would ... Judge Walker, you would agree that it's an extremely important goal of the framers of the Declaration of the Constitution. They wanted to protect individuals from the executive branch more than any other purpose of the Constitution. Then we've got the fact that when they wrote the Constitution, there were immigrants everywhere. Then they deliberately, when they wrote the due process clause, they used the word persons instead of the word citizens because they wanted to include immigrants. That's obvious. For example, three of the first members of the US Supreme Court were immigrants. The idea that they wouldn't have applied as immigrants is actually quite absurd. That's why, that's the reason. Not only that, there's been a long history throughout the entire, since the Constitution was written, that they set a bright line rule. If you're in the United States, you have a right to due process. If you're outside the United States, you don't. That's been as clear. I've got tons of quotes where they said, anyone in the United States, legal, non-legal. These are major cases that have been cited over and over. Matthews v. Diaz, on and on. Zadvidas and just a whole series of 1886, where they said, anyone within the jurisdiction of the United States entitled to due process. This case, Therasa Giam comes along and it's an aberration. It's the first time the Supreme Court has decided not to give due process to someone physically in the United States. Although, the government comes up with all these arguments, but they're just not true. The question is sometimes in the Rafferty case from the circuit and landed people a sentence, whether to extend it to people outside who are entering. The law is very clear. If you're in the United States, you have a right to due process. If you're at the border, the entry doctrine is another story, but that doesn't apply in this case. Therasa Giam, it's very troubling because there literally is no principled way to limit it. If immigrants have due process, if everyone has due process, because it says persons, then why not citizens? Can you apply it to US citizens on the border? Why not? We just think it's a very troubling decision. We would ask the court to limit it to the 25 yards, which they actually did. In their own decision, they said it could only be applied to people who are in the respondent's position, which is 25 yards, and also people who were caught, which my response, the appellant here wasn't caught. He turned himself in, so we think that's a distinction. I would just ask the court to limit Therasa Giam to the fact, which is what the court actually did. Thank you. Can I ask you about your, and I don't speak French, so I'll say your non-reaffoundment interview. Sorry, I'm butchering that for the French people. What do you think that would entitle him to beyond the hearing that he already got? Is it just review by an immigration judge, or do you think judicial review of the immigration judge's decision? What are you saying that, since he eventually got the interview, is your complaint only about the process for that interview, or are you claiming review process? I'm just unclear. Thank you, Your Honor. Basically, to quote Judge Fletcher in the Ninth Circuit, you're giving them nothing. They don't even ask them the question. They don't say, are you afraid to go to Mexico? In his interview, they did ask him that. But not before they threw him out of the country. This was after he was brought back a month later, but before he was thrown out of the country, he wasn't asked anything. They're expecting somebody to go to the border patrol and say, I'm afraid to go to Mexico, which you have to look at these people. Some of them have been abused by their own government, by their own police. He got a later interview. If he had gotten the same interview he got later, right before they returned him to Mexico for the first time, would that have sufficed? For a lot of reasons, no. The standard that they're giving is more likely than not, which is the highest standard that they could possibly get. In credible fear, they ask, do you have a credible fear even, which is a very low standard. It's like one-tenth of the standard. This is extremely high standard that they're giving right at the initial stage. It's basically, ever since the 1200s, there's certain basic requirements to due process, and one of them is to have- I just want to talk about, sorry, I don't want to lose track of what I'm asking. I'm sorry, the international- Obligations for non-refoulement. Your first point is that it should have happened right away the first time before he went, and the standard of review is wrong. They should ask him. He shouldn't have to spontaneously raise the concerns. Is there anything beyond that? Notice before the hearing. There's a lot of things he should have been given. Right to counsel. Lawyers are pretty important to these procedures, more than even if it was Americans. These are children. They're 10-year-old children. Some of them, they've been raped in their countries. They've suffered horrific persecution. To expect them just to know what to do in a foreign country, they don't even give them a translator, by the way. That's not even required. Judge Fletcher said you're giving them nothing. Literally, there's nothing there. A right to, if they ask, they get a hearing, and then the highest possible standard is applied to them. There's no way this meets either due process or the United States obligations under the withholding of removal statute, which is very clear. You cannot refool somebody. If they will be subject to persecution, then the government tries to get around it by saying, well, it's Mexico. Nowhere does it say you can't be sent back. It doesn't say it has to be your obligation to ask questions and to give them some kind of a fair hearing, something that's not just someone basically supposedly asking them questions with no process whatsoever, and then it's supposedly reviewed. Apparently, just anecdotally, the reviews are basically, if it gets granted, then the reviewer just turns it around and says, no, you shouldn't have granted this case. Thank you, Mr. Schill. Let me ask, is there anybody else on the panel who has a question? We're out of time. I haven't even gotten to my main argument, which is the arriving alien, that he was in the United States, which I really would like an opportunity to- Go ahead. I thought you had discussed that argument with Judge Walker. No, Your Honor. Our first argument is the statute doesn't apply to anybody. The MPP should not be 100%, but then our even stronger argument is that it certainly shouldn't be applied to people who are in the United States, because the statute right on its face is titled people who are arriving on land. The title says arriving, and then the subsequent says arriving on land. Arriving is a very plain meaning. I mean, everybody knows what arriving means as a court. In the case of the Las Vagas case, the only other court that's looked at this, I mean, they said, look, you're either arriving or you arrived. There's only two possibilities, and the client arrived. He's not arriving. The Supreme Court definitely said in Theragosian that it's not just the moment of crossing the border. Right. So that's due process, Your Honor. We're just talking about the statute here. I mean, the statute, they have no right to use a statute against somebody in the United States. The statute says arriving on land. I mean, my client was not arriving. The statute doesn't apply. Even if they had to do process rights, the statute just can't be more clear. I mean, arriving on land is not, you know, it's a very plain meaning. We don't need to use any textual analysis. And then, you know, the word arriving on land is not used a lot, but the word arriving is used as arriving alien, and that's a very, very common phrase in immigration, and arriving alien means somebody who's arriving at a port of entry. The definition is very clear. It's under ACFR 1001.1Q. It's someone who's coming or attempting to come to a port of entry. So, you know, I mean, they just really cannot use this. But we have the parenthetical in this particular provision, whether or not it's a port of entry. Right. So then they're using this convoluted explanation. So, of course, they're basically saying Congress doesn't know how to say inside the United States, and when they said inside the United States, they actually said they're not a designated port of entry, which, of course, you know, I mean, why wouldn't Congress just say it if they were planning to overturn years and years of law? But then, you know, and then they're claiming they have a right to apply at 96 hours after entry, which, you know, I mean, they're saying someone 96 hours in the United States is arriving, according to their definition, whether or not. But anyway, we would just really like to give an explanation for that. I mean, there is a very clear, there is a very simple explanation, which is it says whether or not a port of entry, a port of entry is defined as a place with a port director. Okay. And it just turns out that there's a lot of places on the Canadian border, which are called border crossings, but they're not called ports of entry. And, you know, I mean, I can give one, it's called Port Covington on the New York-Quebec border, but there's many, and they're just little border crossings with maybe 100 people per day. And that's what Congress meant. Mr. Sheldon, let's take that example. Let's say that there is a border crossing between Canada and the United States, but it's not a port of entry. Correct. 2BC applies there. Okay. Give me an example of someone who would fall under 2BC at one of these Canadian-U.S. border crossings. How far into the United States are they in order to trigger 2BC? No, border crossings are exactly the same as ports of entry, except they don't, they're smaller. I mean, that's the only difference. So, so there's, you know, they're little, little crossings. So they would stop them as they're crossing the border before they cross the border. So you're saying they were stopping with one foot in Canada and one foot in the United States? No, Your Honor, they stopped them at the border crossing. It's exactly the same as a port of entry. They stop them and they, I mean, Congress just, okay, let me just, just quick. I mean, when we get to this, this whole section, the, the, the, the contiguous removal, who were they referring to? What did Congress, you know, who, it's really a question. Why did they put in this whole statute? And we don't think it had anything to do with Central Americans. And the question is who's arriving at the U.S. border that has a right to enter, but it's inadmissible. And, you know, it's not Europeans because they would fly here. They wouldn't come to a port of entry, you know, the border. It's not Asians. It's not Latin Americans, not even Central Americans. They would fly here if they have a visa. They don't drive up. So really we think it applies to Canadians. And that was the whole purpose of the statute is, is, is really, I mean, it's 35 million people on the U.S. border that, um, that are, are legally entitled to enter, and many of them are inadmissible. And it actually makes sense. I mean, who wouldn't rather be in, in, in Canada, you know, in Toronto or Vancouver while you're waiting for the proceedings? And I just wanted, this comes directly from the case Matter of Science-Opula, which is the case, which, which was the inspiration for this whole statute, this statutory section. And it just, it says in that case, it says on page 154, that certain states along the northern border of the United States, aliens are routinely returned to Canada to await their exclusion hearings. In Buffalo, New York, for example, approximately 120 to 140 aliens are placed into exclusion proceedings each week and returned to Canada to await their hearings. Parole of an alien into the United States from Canada to await exclusion hearings are rare exceptions. In other words, this was really required for Canada, and it actually makes a lot of sense. That, that, you read Matter of Science-Opula, you know, it was really put in for a very specific purpose and never crossed Congress's mind that this was the way it was being used. And that's, you know, there's so much proof of that. You mentioned Mexicans, like they don't even say maybe a Mexican would want, would want asylum, which, you know, they, and they spent so much time writing all these provisions of B1. I mean, Senator Leahy and others were fighting, you know, to make sure it included all these rights for asylum seekers. And then the government wants us to believe just that they simply threw in this provision. Oh, yeah, you can put them into Mexico with no protections whatsoever. That's not what it's for, Your Honor. And, you know, so it really, it doesn't apply. I mean, what they said in the Ninth Circuit, they just said that, you know, there's no plausible way the statute can be read to apply, to apply to the MPP. And then they, you know, they said the government's making baseless arguments in support of any legal policy. And that's, you know, that's pretty much what it is. And then, you know, but they're not even considering the fact that, because they're, you know, the Ninth Circuit, the people weren't even in the United States. So my point was in the United States, in the United States, which makes it so much stronger because of the language, you know, arriving on land and then the due process argument. All right, Mr. Sheldon, we'll let you reserve a little time for our rebuttal. We're out of time. We hear from the United States. May it please the court, Archie Throckmire for the government. The district court did not abuse its discretion in denying the preliminary injunction motion. With the court's permission, the government will address the statutory claims first, the non-refoulement claims second, the constitutional claims third, and will then briefly conclude by addressing irreparable harm. Oh, yeah. Can I just ask you to reverse that order for just one moment? Sorry. This question of irreparable harm, if we, I'm not saying we are, but again, hypothetically, if we were to decide, Mr. Sheldon is right as a matter of statutory construction on one or both of his arguments, then is irreparable harm relevant? That is not if we decide likely victor on the merits, but if we decide he is the victor on the merits. The government's response would be that that consideration would still be relevant, Your Honor, and the reason for that is that this court has always described irreparable imminent harm as a critical part of the four-factor calculus used to assess preliminary injunction motions, and importantly, the showing of irreparable harm. Are you familiar with our opinion in the United States Association of Reptile Keepers versus Zinke 2017 opinion? Briefly, Your Honor. Okay. Well, in that case, we held that if we, that we can, in reviewing preliminary injunction issue, we can decide fully the merits because it's the first question, and if we decide the merits fully and decide that he is correct, that this is a statutory violation, that's the end of the matter, and it makes sense that that would be the end of the matter because whether there's harm to the government or not or harm to the plaintiff or not, once we've decided the merits, there's nothing left to be decided. Yes. So, Your Honor, in that situation, the government would submit that it would essentially be a conversion to some sort of dispositive motion, but again, that is simply not the posture of this case, and in any event, the government strongly disagrees that Mr. Cruz has shown a likelihood of success in the merits, and so if I could... Let me just, on the, I understand your argument on the second point, but on the first point, let me just read from our own opinion. We note that the procedural context of this appeal, which was from a preliminary injunction, does not prevent us from definitively deciding the merits of the clause's meaning. I mean, I think we've decided this question. I don't mean to belabor it, but if we were to decide that you're wrong and not just that he's likely to succeed on the merits of the statutory argument, but that he does succeed, that would be the end of the statute. We vacate the regulation under the APA, but now you can go back to your first argument. Before you do that, let me ask one more procedural question. If the Supreme Court grants cert on innovative labs before we've issued a decision, I'm sure that Mr. Cruz would say we should continue full speed ahead and decide our case. What do you say we should do? The government shares that view as well, Your Honor, and the reason for that is this appeal raises a number of distinct issues not raised in the petition currently pending before the Supreme Court. So turning first to the two statutory... Do you know the status? When was cert filed in that case? Do we know conference listing? Do you know anything about that? We do, Your Honor. My understanding is the Supreme Court is slated to consider the petition at its September 29th conference, and of course the government will promptly inform this court in the event that cert is granted. Okay, thank you. So turning first to the two statutory claims, Cruz makes two arguments on appeal. First, that he is not an alien described in subparagraph A because he could have been placed in expedited removal proceedings even though he was not. Second, Cruz argues that he was not arriving on land when he was apprehended shortly after illegally crossing the border, and the government will address each of those arguments in turn. First, Cruz is an alien described in subparagraph A because aliens described in subparagraph A are applicants for admission who are not clearly and beyond a doubt entitled to be admitted, who are placed in full removal proceedings under section 1229A. Cruz is an applicant for admission who was not clearly and beyond a doubt entitled to be admitted, who was placed in full removal proceedings under section 1229A. Hang on, hang on. The statute says subject to subparagraphs A, B, and C. So that language is all subject to subparagraph B, which then says subparagraph A shall not apply to an alien who is a crewman, someone to whom paragraph one applies, or who is a still ex. So we have to, if you're within those exceptions, then you don't go to section two here, right, C, which is where it says, correct? Yes, your honor. So Cruz's argument rises and falls entirely with section 1225B2B2. That is, he claims that subparagraph A does not apply to him because he is an alien to whom section 1225B2B2. Let me back up and just to have some context here. If he were a still away, the other, one of the neighboring provisions, could the government still put him into section 1229A proceedings as a matter of its own practical discretion or statutory interpretation? So the BIA discussed this, your honor, in a matter of ERM and LRM. The INA prohibits DHS from placing still aways in full removal proceedings. It makes clear that they lack. So that third exception is someone who categorically cannot be put into these So if you were a crewman, your honor, my understanding is he would be similarly situated to an alien like Mr. Cruz, who could have been placed in expedited removal proceedings, but was not. And in this case, section 1225B2B2B3 there is a categorical prohibition, but B1 and B2 are not, is your position? Yes, your honor. And as the government demonstrated in its brief, the reason section 1225B1 does not apply to Cruz is because the categories of aliens amenable to being placed in expedited and full removal proceedings overlap. That is to say, aliens who lack proper documentation, Mr. Cruz, who could theoretically be placed in expedited removal proceedings are also applicants for admission who are not clearly and beyond a doubt entitled to be admitted. Congress doesn't seem to think they overlapped. It says it entitles subsection B inspection of other aliens and that other aliens heading was Congress's duly enacted choice of phrasing. So it seemed to think there wasn't this overlap. So your honor, the government's view is the view articulated in the Ninth Circuit's motions panel decision in innovation one, which is the other aliens and the differentiation between the And again, that stems not just from the overlap I mentioned, but also from the plain text of section 1225B1A1. Section 1225B1A1 notes that an alien inadmissible on specified grounds shall be ordered removed without further hearing or review unless that alien is referred for and passes a credible fear interview. Section 1225B2A by contrast provides for a different process whereby the foreign immigration judge and indeed Jennings described the two provisions in the same manner. Jennings very much described these as two distinct categories of aliens. Very described them out as marked them out quite distinctly. So I'm not sure what to do. Is Mr. Cruz someone to whom the expedited removal provision applies, but the government chose not to put him through those proceedings and chose to give him different proceedings? Your honor, the government's view is that Mr. Cruz is not an alien to whom section 1225B1 applies. And I want to circle back to Jennings briefly and the fact that he described the two categories as separate. Because again, the government's view is this comes back to what the Ninth Circuit articulated in its motions panel decision, which is these are post-inspection mutually exclusive categories, not pre-inspection mutually exclusive categories. And the reason for that stems again from the overlap between the aliens amenable to being placed in both proceedings, as well as the fact that just by the plain text of section 1225B1A1 by its terms, it does not apply to Mr. Cruz. He was not ordered removed without further hearing or review, nor was he referred for for a credible theory interview. Instead, he was entitled to a full removal proceeding before the immigration. The ordered without further hearing is not a description of people who are covered by the expedited removal provision. It's a command to the officer as to what they should do with someone who is arriving. Right? It's not part of the definition of who is subject to expedited removal. It says what will happen to him. Yes, Your Honor, but the government's view is that provision uses the word shall and commands that immigration officers shall order the alien based on specified intermissibility grounds, order the alien removal without further hearing or review. And that simply did not occur here. So in other words, there are two- So you couldn't apply expedited removal to him. You could never have applied expedited removal to him. Could you have? The government's view is that DHS does possess prosecutorial discretion to apply expedited removal to similarly situated aliens, but elected not to exercise that discretion in this particular case. So he is someone to whom, I guess, in your view, both the expedited removal and the 1229A proceedings apply. And so you've said it. The only reason I want to disagree with that characterization is the government would not concede that he is an alien to whom section 1225B1 applies in any way because he is an applicant for admission. What do you mean by prosecutorial discretion? I mean, if it doesn't apply to him, there's no prosecutorial discretion at all. The reason I mentioned that is there are no fixed immutable categories of B1 and B2 applicants. And this is the fundamental error that the Ninth Circuit made in the merits decision that it issued, which is that it assumed that there was this taxonomy whereby aliens arrived at the border with a fixed category and that aliens who lack proper documentation are categorically B1 applicants. But that is simply not the case. But the other things in B, crewmen and stowaways, are pretty much categorical status, right? That's a categorical status. So you're either a crewman and a stowaway or you're not. Correct? Yes, Your Honor. But again... Why wouldn't B2, sorry, Capital B Romanet 2, have the same operation as Capital B Romanet 1 and Capital B Romanet 3? So, again, Your Honor, the government would just go back to the overlap between the two provisions, the categories of aliens amenable to being placed in both provisions, and would also point this court to matter of ERM and LRM, which described the purpose of Section 1225 B2B2, which was just to make clear that aliens who are actually placed in expedited removal proceedings lack an entitlement to a full removal proceeding, because that would produce an incongruent result. And here, there's no... I'm sorry, I think I didn't hear. Could you say that again? I think I'm not sure I heard properly. I apologize. Yes, Your Honor. So in matter of ERM and LRM, the BIA examined the purpose of Section 1225 B2B2, which is central to this appeal, and in that case concluded that it did not strip DHS of prosecutorial discretion to place aliens like Mr. Cruz in full removal proceedings, but rather simply served a clarifying function that aliens who are actually placed in expedited removal proceedings are not entitled to full removal proceedings. And so the government's view is based on that limited clarifying function, there is no basis to conclude that in the same provision, Congress intended to exempt a large swath of aliens from contiguous territory return. Turning to the next statutory argument, and the government's view, Mr. Cruz's claim that he was not arriving on land when he was apprehended shortly after crossing the border illegally is foreclosed by the BIA's recent decision in matter of MDCB, which the government notified the court of via its Rule 28 J letter, as the factual circumstances there are substantially similar to the circumstances here. The BIA's decision in matter of MDCB is reasonable, is consistent with the plain text of Section 1225 B2C, and is entitled the Chevron Deference. In matter of MDCB, the BIA drew heavily on the fact that both Section 1225 A1, which defines applicants for admission, and Section 1225 B2C both use the that an alien apprehended near the border shortly after unlawful entry was arriving on land within the meaning of Section 1225 B2C. And the government's view is... Mr. Brockmire, if you can finish the sentence, I have a question. The government's view is that decision is controlling on this issue. Well, now I have another question. Your argument is that a BIA opinion is controlling on the D.C. Circuit? I'm new here, but... So, the government's view, Your Honor, is that the BIA's opinion is entitled to Chevron Deference, and that comes both from the INA and, as the Supreme Court noted in INS v. Oblier, the fact that the INA specifically makes clear that the Attorney General's rulings on questions of law are controlling, and the Attorney General has the authority to delegate that power to the BIA. Okay, let me ask the question I was going to ask. The same question I asked to Mr. Sheldon. Do you know how long Mr. Cruz was in the United States time-wise? Seconds, minutes, hours? So, there's not a specific record finding on that point, Your Honor. Page 116 of the appendix is the closest the District Court came, I believe. The District Court concluded, based on Mr. Cruz's surrender to immigration agents, my understanding is he crossed the border illegally in the middle of the night on May 10th, and it appears to be that within a matter of hours, he surrendered himself to immigration agents, but there is no specific finding on this point. Well, hang on. I'm sorry, but I'll just say the form I-213 gives the dates and the time that was submitted by Mr. Sheldon. It actually arrived one day and detained the next day, because it was late at night, but it gives the exact dates and time, so I don't know how you say it's not in the record. Yeah, I was just referring to the record before the District Court. The I-213 form, I believe, was submitted as part of a judicial notice motion after a public proceeding. The government's form, you don't dispute the form? You don't think we can get a notice of it? The government does not dispute that form, Your Honor. Do we have dates and time? Yeah, yes, Your Honor. It looks like it was about 90 minutes. Yes, Your Honor. And it crossed over from one day to the next day. Yes, that's the governor's understanding as well. The only reason- Yeah, it's the decision that talked about entry, talked about entry the same day. We only have a BIA decision that says entry and detention on the same day. And with, I think there, it might have been 30 yards. It's still an entry, but that's not this case. So the government's view, Your Honor, is that the facts are substantially similar, and that the BIA's opinion did not depend on the physical distance the alien had traveled, but rather on the statutory text. And the fact that accepting the proposition that Mr. Cruz advances that an alien ceases to be arriving the moment one foot touches United States soil would render the phrase, whether or not at a designated port of arrival, completely inoperative. And the government's view- I get that, but we're not talking about one foot. And my recollection is, sorry, I think, is that MDCV? I can't remember. But talked about arriving the same day. And this was way more than one, this was three football fields. This was more than one foot in. So I just, I don't know where we have, where, when do we get a reasoned interpretation from the BIA on when do you stop arriving and you're arrived? So, Your Honor, I would point primarily to page 23 of the BIA's opinion of where the BIA notes that its reasoning is applicable to aliens apprehended near the border or just inside the border. And the government understands those are qualitative descriptions, but given the nature of the inquiry, there will not be a fixed right-line rule. But the government respectfully submits that this is not a case that implicates the outer limits of that definition. And as a practical matter, the MVP guiding principles generally provide that an alien is amenable to being returned under MPP if he or she is encountered within 96 hours of crossing the border. On the Chevron question, do you know of any cases where a government agency, which has been litigating a question for several years and almost immediately before oral argument in a related case issues a Chevron interpretation and the court accepts that as controlling? I understand the argument that the BIA in general would have this, but we have to at least consider the context here, which is that BIA certainly knows what's going on here. And that if it's the case that it can't in the course of litigation interpret Chevron, then I get a Chevron deference for an interpretation. Why should it be able to get it when it issues an adjudication right before an oral argument? So, Your Honor, I'm not aware of any case that specifically mirrors the facts you just mentioned. The government's view is that the BIA's decision is entitled to Chevron deference because it 1225B2C. And as for the specific timing of this decision, I'm not aware of any considerations that inform that. But again, just based on the structure of the INA and the fact that the Attorney General's rulings on questions of law are controlling, the government would submit that Chevron deference is appropriate here. What text is... I'm sorry, Judge Millett. No, no, go ahead. What text is ambiguous? What text in this 1225 statute has sufficient ambiguity that you think it should trigger Chevron deference? So, Your Honor, the government's view is that if this court concludes that the term arising is ambiguous, then Chevron deference should be triggered and the BIA's decision should be entitled to wait. Okay. Did you say 96 hours is the rule? It's the general principle, Your Honor. The general principle. So, that particular document is not part of the record below. I'm happy to proffer it to the court if the court believes it would be useful. Sorry, I don't know what it is. Is this a regulation, a policy statement, a handbook? Where does 96 hours come from? It's a guiding principles document. So, it's an operational document that DHS has issued to its Border Patrol agents to effectuate the You don't claim any deference to that, though. No, Your Honor. That's merely for additional context and to dispel any concerns about hypotheticals of aliens who have been here far longer than 96 hours being returned under MPP. And again, I'm happy to submit that to the court if the court requests it. It was not submitted below largely because the arriving claim was not raised until oral argument before the district court. And I think maybe it is there. I think it's there. U.S. Customs Border Protection and Guidance Protocols Guiding Principles. Yes, Your Honor. I'm referring to a different document. Those outline the general principles applicable to MPP writ large. The document that I'm discussing hones in on this specific issue when Border Patrol agents consider aliens to be arriving on land for the purposes of Section 1225 BTC. So, the MPP protocols and guidance don't reference 96 hours? The specific guiding principles that are currently in the appendix do not refer to that one. Are there other MPP guidance or principles that do reference 96 hours? Aside from the document I just mentioned, I'm not aware of any other documents. I know that my time has long since elapsed, but I would like to briefly address the non-refoulement claim. So, the district court correctly concluded that Section 1252 A2 B2 bars judicial review of this claim. And as an initial matter, Mr. Cruz does not address that holding in his opening brief. So, it's the government's view that he's waived. Any arguments he might be able to advance on this issue. But in any event, the government submits that the district court's holding was substantively correct and consistent with this court's precedent. Section 1225 B2C provides that the Secretary may return aliens, provided that they are statutorily eligible, and that no other provision of the INA constrains that authority in any way. In other words, Section 1225 B2C bears both hallmarks that this court attached substantial importance to in Zhu versus Gonzales, in considering the National Interest Waiver Statute. I'll just back up and ask one more time. C talks about in the case of an alien described in subparagraph A. And then subparagraph A begins subject to paragraphs B and C. And just to be clear, so your definition, you don't read that subject to paragraphs B and C as someone who's described in B. You just mean it as someone who hasn't been treated under B, just to be clear, right? That's what you mean subject to paragraphs B and C. And 3A. 2A, sorry. It's what subject to means. Right. So the government's view is that Section 1225 B1 does not apply to Mr. Cruz because he was not placed in expedited removal proceedings. And so he's not subject. He's not covered by subject to paragraph B. Got it. So subject to is not a statutory reference. It's a reference to prosecutorial discretion judgment. In the case of Section 1225 B2B2, yes, Your Honor. And again, the government referred back to matter of ERM and LRM proposition. Sorry, I interrupted you. Can I, can I, can you just tell me again the non-reviewability provision that you're talking about? Yes, Your Honor. Section 1252 A2B2. Okay. Can I ask, you have a very, I think you have a very brief reference to another provision. We're talking about refoulement now, right? Yes, Your Honor. The district court's disposition of the non-refoulement claim. Right. So, and that's 1231, right? That would be the 1231. Actually, that would be relevant. Is that right? The government's view is that Section 1231 does not apply in this case because Section 1231 concerns removal, which is a different context than contiguous territory return. So my question is, is that in your brief, you briefly mentioned 1231 H, uh, hold on. Yeah. H, which says nothing in this section shall be construed to create any substantive or procedural right or benefit that's legally enforceable by any party against the United States. There's just a briefest mention of, I think it's in your brief, somebody's brief. Is this, why is this not the section that you would be relying on for non-reviewability? No cause of action, put it that way. Sorry. But the government certainly has no objection to this court. I know, but there must be some reason I'm missing. I don't want to make a mistake here. What's, what's the reason that this section isn't relevant? So this largely just stems from the court's order of operations in June. In June, this court concluded that Section 1252, A2, B2 bar judicial review. And then it had no need to consider whether, for example, the agency discretion by law exception to the APA applied. So in the government's treatment of the issues in the order of operations in our brief, we similarly viewed Section 1252, A2, B2 as a threshold jurisdictional issue. And then the lack of a cause of action as an alternative argument. All right. If you're wrong about the discretionary question and therefore the jurisdictional question, would this apply or not apply? Would A2 apply or not apply? Isn't there, the petitioner's argument is under this section, right? That they, they, they argue 1231 should apply. Yes, Your Honor. And then we have a statutory provision that's that very section that says nothing in this section shall be construed to create any right. Yes, Your Honor. I'm not trying to make your case for you. I have some feeling that I'm missing some reason. That's not usual that the government buries its best argument in one sentence and then doesn't make it. So I just feel like I'm missing something here. So again, Your Honor, we have no objection to this court concluding that there is no cause of action here because the treaty obligations are not self-executing. There is no domestic statute that is applicable. Again, the reason the government ordered the issues the way it did in its brief is because we viewed the injunction that Mr. Cruz sought as clearly triggering section 1252A2B2 because he asks this court to set aside the discretionary decision to return to Mexico. And moreover, that is also the ground the district court below ruled on. And for those reasons, we've led with our section 1252A2B2 argument, but we would certainly have no objection to this court concluding that there is no cause of action or mechanism to challenge the implementation. Did you argue that? Did you argue that in your brief? We did mention 1231A2B2. You mentioned it. That's not the same thing as did you make an argument that there's no cause of action here? The government did assert that because the treaty obligations are not self-executing, that there is essentially no mechanism for Mr. Cruz to challenge the non-defendant obligations that issue here. You just have this one line here. It's just this one line and there's no argument. There's no citations. There's nothing here. Is that sufficient to raise an argument? So, again, Your Honor, that line concerns section 1231H, but the government believes the preceding paragraph also builds on that argument. And in any event, we'll also submit that the section 1252A2B2 bar applies here as well. And finally, just to conclude in the government's view, the Supreme Court's recent decision in DHS versus the Regents of the University of California decision, that decision forecloses Mr. Cruz's equal protection claim because like the litigants there, Mr. Cruz relies on a number of statements made by the president remote in time and unrelated to MPP. And for that reason, he has not made out a plausible equal protection claim. I'm sorry. I apologize. I just wanted to hop back to the non-re... The guidance and principles issued by the secretary of DHS were specific and explicit that protections under Convention Against Torture and non-refoulement protections would continue to apply. Is that right? Yes, Your Honor. In promulgating MPP, DHS made clear that it would abide by all relevant non-refoulement obligations. Does that create any rights, then, if you don't? So, Your Honor, the only situation in which the government believes it would create such rights is if, for example, the claim was that the agency failed to abide by the prescribed non-refoulement procedures. But importantly, that is not the claim here. Mr. Cruz was afforded a non-refoulement interview after... Well, no, but long after he'd been returned and then brought back in. And even when he was finally given one, it's not clear that he was returned. So, let me address both aspects you just mentioned as to why he was returned initially without receiving a non-refoulement interview. That is because the agency made the choice that in the context presented by contiguous territory return, the onus is on the alien to articulate a fear of return. And importantly, Section 1225B1A1 also notes that similarly for the credible fear process to be triggered, an alien has to indicate an intention to apply for asylum or a fear... I know, but the agent... But the secretary was explicit that existing non-refoulement procedures and protections would be retained. Did not say that we would change those in a way. It's not ordinarily required that they... Is it ordinarily required that they raise the issue first or is that normally outside this context? Is that something that's asked by immigration officers or immigration judges even? So, I'm not sure I fully understand your question. Is it about... Sorry. So, shifting the burden to the immigrant to spontaneously raise concerns about covered by non-refoulement, concerns about torture or mistreatment in the 1229A procedures? So, the only reason I'm hesitating to answer your question is, credible fear interviews only occur in the course of extradited removal proceedings under Section 1225B1. After the alien expresses an intention to apply for asylum or a fear of persecution, then the immigration officer asks the alien discrete questions. But importantly, the context here is fundamentally different. Okay. So, under 12... Let me be clear. Under 1231, restriction on removal to a country where an alien's life or freedom would be threatened. If you're applying that process, put aside MPP. If you're applying that process ordinarily, my understanding is that the burden is not on the individual alien to first raise that question without notice, without counsel. So, they just have to spontaneously raise that. Is that true? In the context of full removal proceedings, I believe that's correct, Your Honor. Okay. So then... Okay. Go ahead. Yeah. So, just to reinforce the point I just mentioned, the context here is fundamentally different. And importantly, an alien can express if you're returning to Mexico at any point during the time that his removal application or removal proceedings are pending in the United States. So, an alien can have multiple non-refoulement interviews. And indeed, some aliens have had multiple non-refoulement interviews. But I'm just going back to... If the MPP protocol has said we're going to continue to adhere to non-refoulement obligations and practices, then changing this whole process, the burden of raising the issue, the level of proof by which they have to raise it, the lack of notice, that's all different, isn't it? That is a change. So, it is a change, Your Honor. But the government, again, believes that the context here is different, that it's not a departure from previously existing policies that were applicable in an analogous context. So, the considerations applicable to contiguous territory return of an alien to a country that he or she transited through, those considerations are fundamentally different than the considerations of returning an alien to the home country where they may face persecution. And the government's views, the agency was... Well, then why did the guidance say we'll be treating them the same? So, the MPP guiding principles simply discuss non-refoulement generally and the principles of non-refoulement. And in the USCIS memo applicable to non-refoulement interviews, USCIS is clear that the withholding of removal regulations are inapplicable because, again, these are not removal proceedings. But then how can it be... So, is it your position that the Refugee Act and the Convention allow return? If someone actually were, they didn't know to raise it. They just didn't know they could raise it. So, they actually were in fear of being harmed in Mexico. Your view is that you're not obliged to apply that for a contiguous territory return? So, that's... That view, the government's view is not that it does not have to abide by non-refoulement obligations, but rather that nothing in Section 1231 or either of the treaties you just mentioned prescribes any minimum procedures that the comply with its non-refoulement obligations. And accordingly, the executive branch was entitled to rely on a different context presented here to fashion different non-refoulement procedures. And I would also refer this court to Section 1231b3a, which notes that it is for the attorney general to determine if an alien's life would be threatened based on a protected ground. So, no part of Section 1231 prescribes a minimum set of procedures that the executive branch has to follow. And so, the government's view is that the procedures here are fully adequate to satisfy all relevant obligations. But this procedure would be adequate even in a full 1231 removal proceeding? But again, your honor, the government's view is that context is fundamentally different. You just told me all you're obligated to do under the Refugee Act and the convention, all you're obligated to do is what you've done here. Is that true or not? Yes, your honor, that's true. So, you could do this exact same process and we've just been extra generous so far. So, the government's view is, again, taking into account the considerations unique to removal of an alien to a country where they may be facing persecution or torture, and where they may have no other opportunity to raise a claim of fear, the procedures fashioned are different. And I would also point this court to the Supreme Court's decision in Thurisidium, where in pertinent part, the Supreme Court discussed the abuses of the credible fear process, the fact that there's been almost a 2000% increase in credible fear claims, which have in turn exacerbated the existing burdens on the immigration system. And so, given those burdened concerns, the government's view is the agency was entitled to rely on the specific context presented here to fashion nonrefounded procedures. Is there someplace where the DHS explains this rationale that they must think there's a reduced risk of torture or mistreatment in a country to which you're returned rather than removed? Where is this explanation for change in policy? You just described it as a different country, but it's clear that nonrefoundment applies to third countries as well. So, where do they explain why the risk is lower? So, in the October 20th, 2019 assessment of the migrant protection protocols, DHS explained that based on its experience... Sorry, I didn't hear. Which memo? Yeah, it's not a memo in the appendix. It's a publicly available assessment of MPP that the government relied on below. And again, I can also submit this document if the court believes it would be helpful. But in that document, DHS explained its view that based on the agency's experience in administering credible fear interviews, its view was that if it altered nonrefoundment procedures in a manner suggested by litigants like Mr. Cruz, the number of fear claims would become overwhelming and would lead to officers there are. And again, based on the Supreme Court's decision at the recision, that concern is not purely conjectural. I don't understand. Is burden... Nothing in what you just said said that they were improper or not credible, credible fear claims. Is the agency able to establish a standard that rejects these claims simply because accepting them would be too burdensome? Is that consistent with the treaty and the statute? No, Your Honor. So the government's view is that in the credible fear context, for example, in Thursday's hearing, the Supreme Court noted that of the large volume of credible fear claims that are made, many turn out to be meritless. And more importantly, many turn out to be abandoned and litigants and aliens simply abscond into the interior of the country. And the government's view is just given that concern... There's no risk of absconding into the middle of the country in that sense. We're just talking about having the interview here and deciding whether return versus detention is warranted. So I don't know. Maybe there are a lot that end up not to have merit. Are there a lot that also do have merit? So it would not be possible for me to quantify the number of claims that would have merit and the number of claims that would not have merit. The government's view is simply that the agency acted reasonably in relying on that concern and its experience as administering credible fear interviews to fashion the procedures that it did. And again, Mr. Cruz did receive a non-government interview after he came back to the United States for his July 30th hearing. And during that hearing, he was afforded an interpreter. The interview occurred in a non-adversarial setting and the results of the interview were subject to supervisory asylum officer review. I'm going to cut you off and just say that the document you referenced that you said isn't before us from DHS, I would like to, if it's okay with my colleagues, I would like to have that submitted. Understood, Your Honor. I will submit that. Sorry, Judge Walker. The worst version of what you've just described, I'm going to describe. And then I want you to tell me, if you would, why that's not actually what happened. There are tons of border crossings and asylum claims. And as you said, they're up 2,000%, or at least they were. And that's an administrative burden. One way to avoid that administrative burden for asylum seekers is to just not ask them if they're seeking asylum. The guidance from the secretary says a third country national should not be involuntarily returned to Mexico if the alien would more likely than not be persecuted on certain reasons or would more likely than not be tortured. If you ask everybody that you're going to return to Mexico while they're waiting on their asylum claims, if you ask everybody, are you more likely than not to be persecuted and are you more you're going to get more yeses than you would if you just don't ask the question. Because there will be some number of people who just don't know that they're supposed to tell you they're afraid that returning to Mexico will lead to either their persecution or their torture. And that's a good thing, you say, from DHS's perspective, because it's less of a burden on DHS if we just bury our head in the sand here. Is that the reason, is that really the reason that DHS has decided not to ask people they're returning to Mexico if they're more likely than not to be persecuted or tortured? Or is there a different reason? So the missing component of your question, Judge Walker, that I would just point to is that returning to the credible fear process for a second, in Thursday's Supreme Court, that not only was there a massive increase in the number of credible fear claims, but many of them turned out to be completely meritless and were abandoned. And so the government would just point to that and state that based on that experience with a number of credible fear claims that turned out to ultimately be devoid of any merit, DHS fashioned different procedures in this context and was entitled to do so. And so DHS made a policy decision exercising their discretion that in order to avoid the burden of a lot of frivolous claims, they would adopt a policy that is guaranteed to not catch some number of meritorious claims. So the government resists that characterization simply because a number of aliens have articulated a fear of returning to Mexico like Mr. Cruz. And again, Section 1225B1A1, even in the credible fear context, provides that a credible fear interview doesn't occur until an alien first expresses an intention to apply for asylum or a fear of persecution. And so in the government's view, this situation is not meaningfully different from that statutory commands. Okay. Is more likely than not different than credible fear? The more likely than not standard is what is ultimately used to determine whether an alien has a credible fear. Yes, Your Honor. I'm sorry, I wasn't clear. In expedited removal, to get to an asylum hearing, do they have to upfront, do they have to show more likely than not? Or just to get to the hearing, do they just have to assert a credible fear? Yes, it's a credible fear more likely than not. Or is it plausible, substantial? It's a reasonable probability. That's my understanding. That's the burden at the credible fear stage. So for expedited removal, if your prosecutorial discretion had left him there, he would have to just show a reasonable probability. But because you processed him under 1229A and subject him to return to Mexico, he has to show more likely than not. Is that right? Yes, Your Honor. And again, another important difference between this case and credible fear claims I would point to is the fact that aliens do not receive more than one credible fear interview. Whereas aliens can and do in fact receive more than one non-refoulement interview because they can articulate a fear of returning to Mexico at any point while their removal proceedings are pending in the United States. And just to very briefly... All right. I think it's too late to be very brief. I think we have your arguments. To the extent we don't, we have them in the briefs. I'm going to let Mr. Sheldon have two minutes. And thank you very much for your argument. Thank you. Just briefly, I'd like to get to... More likely than not, it's completely different than credible fear. Mr. Sheldon, we're having trouble hearing. Maybe you need to speak more directly into the microphone. Can you hear me now, Your Honor? Yeah. Okay. Thank you. So more likely than not, it's completely different than credible fear. Credible fear is set out in D1 in details, extremely low standard. More likely than not, you have to prove beyond more than 50% that you will be persecuted. It's extremely hard standard for someone to meet without evidence, without a lawyer, without any type of procedure. I mean, it's virtually designed so there's no chance on earth that they're going to pass. The government claims they don't have money, that it's too much of a burden. I mean, CBP and ICE have a budget of $19 billion. The entire EOIR is $350 million. I mean, the cost of them doing hearings is negligible compared to their cost of detaining 60,000 people a year that could cost the same as sending them to college for a year. Again, back to Judge Millett, I mean, never before in history has there been a procedure where you have to ask... In the US, where you have to ask the government and tell them you're afraid. I mean, that is a completely new standard. And we would analogize it to asking a detained person, a person to ask for water instead of being given water. It's a completely new and a completely arbitrary and reasonable standard. Okay, so 1231, I mean, just read it quickly. I mean, it says the Attorney General may not remove an alien to a country if the Attorney General decides the alien's life or freedom would be threatened. I mean, it says may not, and it doesn't say any of that. What do we do with this sort of no cause of action kind of language? Oh, Your Honor, I mean, okay, there's a presumption in favor of judicial review. This is not a question of review. It's not a jurisdiction. That's a question of cause of action. What do I do with that language? Again, the government didn't bring it up previously. It's kind of... That's not... The government does have a sentence, and I didn't think of it myself. I'm sure I would never have thought of it myself because the statute is awfully complicated, but it is included in the government's argument. Do you know anything about it? If you don't, I understand it's because you... Yeah, I don't know about it, but it just... I mean, clearly the Constitution, the statutes, all that takes great precedence over one little line where they say that you don't have an individual right. I mean, I think what they're referring to would be a litigation or a lawsuit where you're asking for damages. I mean, I don't think they're talking about the constitutional rights or the statutory rights of 65,000 people, including 16,000 children that have been sent to another country. I don't think that's what Congress meant at all. But did you... You didn't sue under 1231H. You sued under the APA, correct? That's exactly correct, Your Honor. We're not even talking about immigration. This case really has nothing to do with the immigration statutes, with removal. I mean, our client has not been removed. He's not even... We're not even discussing that. We're talking about whether the government can grab people with armed police and throw them into Mexico while they're awaiting the hearing. This would be a... Is there any question in your experience as an immigration lawyer that the cat protections that are in 1231 may be raised on at least review of a final order of removal? Okay. First of all, it's withholding of removal claims. A cat would be a separate provision. But no. I mean, absolutely, 100%. This case could never be reviewed on a question of removal in the Court of Appeals. But for the removal case, it has nothing to do with the removal case. I mean, if I even brought it up, it would be utterly irrelevant. I mean, the only question they're going to look at is his removal. Did he get a fair procedure in his removal case? This has nothing to do with it. I mean, except for the fact, of course, that only... Maybe we could argue that only 22 cases have apparently been approved out of 11,000 cases that have been decided in the MPP context because people don't have lawyers. They don't have any type of... No, they don't even know they have hearings. Mr. Sheldon, who grabbed him? He turned himself in. I mean, he was... That's what I thought. That's what I thought. But you said a moment ago, he was grabbed by armed people. Well, I mean, grabbed and thrown out of the country. I mean, he was taken... He was woken up one morning. He thought he was going to be placed in proceeding with the states as everybody else has for the last forever. And then he was just grabbed and handcuffed on and thrown into Mexico, literally without any... He says in his statement, he says, this wasn't a question, it was an order sent out of the country. What do we do with the case Omar v. McHugh? The government briefed it pretty extensively, and I don't think you mentioned it in your reply. It says that it's a DC circuit case that says when it comes to the question of whether or not a foreign country is going to torture somebody we're sending there, judges don't decide that. That's a decision completely in the executive. Right, Your Honor. That's completely, again, a lot of government smoke here, trying to distract the court... I'm not asking about the government's argument. I'm asking about the DC circuit finding precedent Omar v. McHugh. Those cases are about extradition. They have nothing to do with this case. I mean, when you have an extradition treaty with another country, that supersedes anything else. I mean, if the United States signs a treaty with England and we're returning a criminal, okay, then they can't start bringing up what's going to happen in England. That's not what we're talking about here, Your Honor. There's no treaty. There's no... I mean, this is asylum. It's completely different law. You're seeking perspective relief. And when it comes to the refoulement question, let me rephrase. Assume that I think at this point, Mr. Cruz has received all of the refoulement process he's entitled to, and that his refoulement claim has been adjudicated by Homeland Security in an appropriate manner. I know you don't think that, but assume I think that. You're seeking perspective relief. Even if I were to agree with you that he should have gotten the interview earlier, what do I do with that? What can the court do with that? Okay. I mean, there's four different ways or something we can win in this case. I mean, the statutory argument on the MPP, the statutory argument on the alien, whether he's in the United States. I mean, that's just one of our arguments is the international withholding of removal, Your Honor. Okay. I'm good. I'm good. I mean, obviously, obviously- Mr. Sheldon, if you could just wrap it up in a sentence or two, that would be helpful. Oh, my gosh. I'd like to just talk quickly about the Chevron difference. I mean, I just want to mention there is an agency regulation, and if the government, the court's going to give Chevron difference to anything, it should be this regulation that's existed since the statute was put in. And it interprets the contiguous territory provision and limits it to arrivals in support of entry. So that should actually take precedence over matter of MD. Just cite that regulation for us. It's the, you know, it's deregulation interpreting the, the- Is this, I'm sorry. It's, yeah, it's HCFR 1235.3D. Thank you. And, you know, it clearly says that it's only supposed to be applied to aliens arriving at a land border port of entry. In other words, even if the government, when writing the regulations, didn't think it applied to people in the United States. Irreparable harm. I mean, oh, I do want to mention one thing. There's like, you know, Gordon B. Holder from this says the perspective violation of a constitutional right constitutes irreparable injury. We think this is a constitutional violation. So that would take care of the injury, you know, the irreparable harm. But, you know, in addition, Mr. Cruz was sent to one of the most violent places on earth, an area controlled by the Juarez drug cartel, not the Mexican police. He's living in daily terror. He's afraid he could be sent back to Guatemala by the Mexican government. He's afraid that he could be killed by the same people that are after him from Guatemala. They could find him in Mexico. I mean, you know, to say that there's no irreparable harm, I mean, I would analogize this, whatever, to 1939, the boat St. Louis arrived off the Florida coast and, you know, they sent it back. I mean, you know, he's also subject to an obviously badly malfunctioning asylum hearing system where 22 cases have been approved out of 11,208 that were ordered removed. I mean, clearly he has irreparable harm on the jurisdiction. I mean, you know, this case, if you will, because it's not about removal, it's not about immigration, it has nothing to do with discretion. Because, you know, under Zadvaitis and other cases, the court said the authority is not discretionary. You know, the agency's authority is not discretionary. Just to wrap up here, I just want to, a few blocks from the courthouse, there's a monument to the Japanese Americans during World War II held, to the Japanese Americans who were detained in World War II, held to be legal by the Supreme Court in Korematsu. There are quotes from President Reagan, senators, other apologizing, saying this must never happen again. Yet today the government is violating the law and the constitution to send women and children seeking asylum in our country into extreme danger. It may not be popular with this court, sure, the government to follow the law. I have a few other, I mean, I don't know if there's more questions, I have a few other things I wanted to say, but I realize I'm out of time. All right. Thank you, Mr. Sheldon. Thank you very much, Ron. Thanks to both counsel. We'll take the matter under submission. Thank you very much, Ron.
judges: Garland, Millett, Walker